Thank you so much, Your Honor. Kira Klatchko, I'm here on behalf of the appellant, Sean Hargrow. I'm going to attempt to reserve a little bit of time for rebuttal at the end, and we'll see if that's possible. As the panel is no doubt aware from the extensive briefing in the case, I think it's about 150 pages total, there are a number of issues at stake in the case, but the overarching sort of theme uniting all of them has to do with what questions a jury is entitled to hear and decide. And if the court looks at what Judge Campbell did at the district court, it's clear that he made an effort, he gets an A for effort, to get everything right, to go through all of these issues, but it seems that he had sort of a lack of faith in juries and what they're allowed to decide and what they should be allowed to hear. And if we split the two issues, as we've sort of tried to do in the briefs, into the summary judgment set of issues and the jury trial set of issues, in the summary judgment set of issues, Hargrow has not disputed the statute of limitations issues. So sticking with the statute of limitations as set out by the trial court, the error comes when the court starts going through each individual act in terms of first the disparate treatment and then into the hostile work environment. In the disparate treatment context, the court says, well, being called an epithet and having someone get in your face and yell at you, well, that's not adverse. That's not adverse. The court does the same thing when we change someone's work schedule, give them more work, without explanation. And there seem to be a number of cases from this circuit for each of those specific types of acts suggesting that, in fact, they do rise to the level of adverse employment actions. So in the context of changing someone's work schedule, all of those different things, there are a number of cases talking about why that changes the conditions of employment. Well, it seems to me what Judge Campbell did was that he took each one of your claims and saw what evidence there was for it, and for the four of these claims, he decided that there wasn't enough to go to the jury, so gave summary judgment, and then went to the jury on the issues where there was enough to go. That seems to me to be a very logical approach. Now, specifically on the disparate treatment, he says there is the one where the person said boy. Yes. And then identifying one of two people that he didn't know, and somebody said the black  Yes. And that's all there was. And he said that those are just the types of things that sometimes occur, but is not sufficient to raise the disparate treatment of this defendant. Now, what's wrong with that? Well, I can understand Your Honor's point. If, in fact, we looked at those, just those isolated incidents, it might be that those were not adverse employment actions. But there were more incidents, and there was evidence in the record that Sean Hargrove was a boy, so, I mean, really, the boy incident is where things start to escalate. Before he reports Yes. Wait a minute. There was more evidence of disparate treatment? Yes, Your Honor. In terms of the work schedule, there were numerous incidents, and I believe the easiest one to point to that is clearly within the statute of limitations on both Title VII and 1981. So when the summary judgment order came out, you filed an objection saying that it's wrong? There was extensive briefing on the summary judgment, Your Honor. If that's what you – the particular issue I would be referring to. No, no. I ask you, when Judge Campbell said this is the only evidence that deals with disparate treatment, did you then file something to say that, no, you're wrong, these other issues deal with disparate treatment? I believe, Your Honor, that there was a motion for reconsideration filed on the summary judgment, and it was pointed out that there was evidence that the workload had shifted, and I believe it was actually undisputed that in May 2002, if I'm not mistaken, Sean Hargrove's workload increased to the point where he had a manager ride along with him in his truck, and he needed assistance from the manager to even complete the route because it was so much heavier than his previous route. And, in fact, you see, this is the difficulty I'm having. Maybe you can help me out on this, is that in analyzing each of these, the judge is looking at several aspects. One, he's looking at the nature of the complaint. And, clearly, the reference to boy is highly charged and prejudicial and discriminatory. But he has to couple that to see if there are other incidents. And each one of those he's looking at, is it disparate? Was it based on race? Is there any evidence that it's the same supervisor? Is there any evidence that it's his supervisor? And as he goes through each of those, in effect, they fall out. And that's where I think you have a bit of a burden to overcome, because you can't just lump them all together and say there's discrimination. You have to go through each of the legal criteria, and that's what I thought that the district judge did. Where did he go wrong? Well, in terms of, and Your Honor raises a good point, in terms of the supervisor question, there was a discussion in the summary judgment stage having to do with, well, who is the supervisor? Is Mr. Fitzgerald the supervisor? Is Mr. McHugh the supervisor? Is Tim Christensen, the man who made the comment, a supervisor? And I think this case is similar to if you look at Porter v. California Department of Corrections or Ray, when you have a situation where you have a whole department, it seems that if there's a complaint made, things trickle down, and all of these people in management start taking it out on the person who's complained. And I think that's why, Your Honor, we have argued that that question as to who was a manager, who was a supervisor, should have gone to the jury, because there was some dispute about that. And when you get into the question that was ---- Kagan. Now you're mixing and matching the summary judgment with retaliation, which did go to take each of these incidents and put them into the construct that they came to us on. So we have ---- if we could first stick with the summary judgment. Yes. In terms, purely summary judgment, avoiding all of the retaliation claims, you're allowed in a disparate treatment sense to look at some context, even though each individual incident of disparate treatment is on its own. In the context of Sean Hargrove being verbally assaulted, let's just leave it at that for now, and having complained about, I mean, the whole program started when he complained about another coworker who was referred to by a racial epithet. In the context of that, a change in his work schedule, in his work schedule, not in anyone else's work schedule, so that it became so burdensome that he couldn't even complete it, that would be an adverse employment action. And I think that there are several cases that the Court has decided in this circuit that talk about when a change, unexplained change, is actually a separate adverse employment action because it affects his working environment, his ability to fill his job, and the same thing would be true of him being ---- The Tenth Circuit says, you know, life has some bumps on the road. Yes, Your Honor. And they say that these are mere inconveniences, that change of work schedule is unfortunate but doesn't rise itself necessarily to show discrimination. Would you accept the Tenth Circuit analysis of this mere inconvenience? No, Your Honor. I don't know that we have any case to the contrary in the Ninth Circuit. What I would say, Your Honor, is that that's a very restrictive way of looking at adverse employment action, and all of the cases from this circuit take a slightly more expansive view about what an adverse employment action is. And mere inconvenience is fine if you ---- if it's really, there's no context, suddenly, you know, everyone gets a heavier workload, everyone's hours change, and that's the Wray case, too. He works at the post office. Suddenly, there's a fixed start time for everybody. But that's not what happened here. Well, if you take the other, take a vacation request. He got denied some vacation. He got denied a vacation request. Yes. And if you run that through the McDonnell-Douglas analysis, is there anything to suggest that it's race-based and that there's some pretext involved? It seems like he didn't overcome this burden. In terms of that incident, and also I believe there was an incident having to do with a request for time off. There was one overtime request. Yes. It became, I mean, out of context, of course, well, this happens, you know, we can't let you off right now, we don't have anyone to cover your shift. But in context, Sean Hargrove provided evidence at the summary judgment stage that white coworkers, even coworkers who did not ask for additional time in the context of the overtime hours, didn't ask for additional time and were less senior, and they still were awarded extra time. They still were awarded extra time. That would be a deviation from policy. And there are several cases talking about when you deviate from a standard policy, that right there is evidence that should get you through the McDonnell-Douglas test. And I do have five minutes left, so I want to wrap this up a little bit. But in terms of the hostile work environment, there seemed to be an awful lot of things going on here. And the hostile work environment covers a long period of time. There are incidents that are clearly within the statutory period, statutory period. And the earlier incidents, I mean, there's a clear escalation. Sean Hargrove complains. The next thing he knows, he can't get the time off he wants. His overtime hours change. He's yelled at at morning exercises. He's called names. And if you look at his ---- He was what? He's called names, Your Honor. He was called, boy, apparently in his first ---- That did occur, yes. Yes. In his ---- But he wasn't one of them who was identified as the black one. No, Your Honor. That was ---- They were not by supervisors that make the big decisions. Well, the question is who is, again, Your Honor, who is a supervisor? And especially in terms of the hostile working environment, if you look at Porter, if you look at Ray, if you look at cases along that line, it becomes very difficult to tell who a supervisor is and who has the authority over this employee. And if you note, on all of these disciplinary letters and things, all of the various potential supervisors are noticed and were part of the decision. So that question possibly should have gone to the jury, and that's what Hargreaves argued in the brief. I'm sorry, Your Honor, did you have a question? No. No. Okay. Quickly, on the second issue, I think we've submitted everything in the brief having to do with the trial and the retaliation, and I don't have much to add other than to say, again, the jury needs to have enough before them to make the connection between the protected conduct and the retaliation. And here, what they were denied, I think Federal Express pretty clearly argues, well, Hargrove put in all of this evidence and he had a chance to say what he was complaining about, but that's not entirely true because he never was able to connect all the dots, and he should have had an opportunity to do that. And with that, unless there are questions, I'd like to reserve my time. You may reserve your time. Thank you, Your Honor. Good morning, Your Honors. Keith Thomas on behalf of Federal Express Corporation. I do want to address some of the issues that were raised a moment ago, but before I do that, I wanted to point out one thing that is not readily apparent from the party's brief. The appeal was on the entire judgment, which involved the dismissal of two ADA claims, a disability claim and a retaliation claim, and also a Arizona Employment Protection Act claim. Those three claims were not briefed by the appellant on appeal, and as such, it's our position that they have abandoned those claims on appeal and the dismissal of those should be affirmed. Similarly, the racial harassment claim at the summary judgment level, when FedEx put on its motion and evidence and argument on the racial harassment claim, the plaintiff's counsel at that time did not respond to the summary judgment claim at all, or excuse me, to the racial harassment claim at all. And that was why the court granted summary judgment, and we believe that it was not error for the court to do that. Essentially, the non-moving party has the burden to put forth evidence and arguments showing that there's a disputed fact, and they didn't do that in this case. So there's no need to look at the merits of the racial harassment claim. With respect to some of the factual issues that are raised, we do believe that Judge Campbell not only gets an A for effort, but also for a correct result as well. On the race discrimination claim, Judge McCallum, you kind of hit on it a little bit. What they are trying to do is lump basically everything into this grand scheme without looking at it in the specifics. A disparate treatment claim is analyzed differently, as you know, than a retaliation claim. It's analyzed differently than a racial harassment claim. And you have to look at the various factors that go into each one. You can't just look at it in this grand scheme. Certainly, when you get to the issue of pretext, issues such as the comments that were made might come in as evidence one way or the other. But when you're looking at the issue of whether a particular action counts as an adverse employment action, you look at the action itself. And the standard in this circuit, as Judge Wallace noted, is similar to the Tenth Circuit. In their brief, they mentioned that there's no requirement of materiality, but that's not correct. In Davis v. Team Electric, which I believe is a 2000 case, that's 520F3-1080, he quotes in that case, one that is adverse employment action is one that materially affects the terms and conditions of employment. So there is an element of materiality. An adverse employment action is not every little trivial bump in the road that can occur. The increase in workload, which I believe they referred to as a change in the work schedule, that came about in March 2002. And the problem with that scenario and the reason the Court granted summary judgment with respect to that issue and didn't hold that it was an adverse employment action is the plaintiff put on no evidence that it was permanent and that it wasn't just a one-time transitory thing that happened on a single occasion. Furthermore, there was no evidence one way or the other as to whether or not anybody else had their workload increase. And again, going back to the Davis case, that was the issue in the Davis case was that the plaintiff was alleging, hey, I'm getting all these bad work assignments while all my cohorts are getting all the nice cushy assignments. And the Court specifically used the word there was evidence of a disproportionate assignment in the work. We don't have that in this case. There's no evidence one way or the other. A month later, he goes off on disability and never comes back to work. So we don't know how long it lasted. He doesn't even identify who it was that gave him the increase in work. We don't know whether it was because of the increase in volume at the station, and we don't know. What about the overtime, which counsel for Mr. Hargrove says was a policy issue and he was the only person that didn't get the overtime? Well, that's not entirely accurate. Again, we're talking there was one instance in September 2001 when he signed up for overtime, and it was given to another employee. When he brought it to Tim Christensen's attention, hey, it's going to this other employee, Mr. Christensen said, oh, sorry, wrote a note to both Mr. Hargrove and to the other employee and said, make sure you sign up for overtime, and took it and gave it to a third employee. The problem there is, again, seniority under our policy is not the only factor that goes into the reward of overtime. There are several different factors. The most important one, and the summary judgment evidence shows this, is that they try to rotate overtime between employees so that you don't have one employee getting the majority of the overtime. They try to fairly and equitably distribute it among all those who wanted it, and Mr. Hargrove put on no evidence that under that policy, either based on seniority alone or in addition to the other factors that are in the policy, that he was entitled to the overtime hours on that particular occasion. So, again, there's no evidence. You know, the evidence was that when it was pointed to a certain person who hadn't signed up for them, they corrected that situation and gave it to somebody else. But, again, there's no evidence that he was entitled to it. And, again, it happened on one single occasion. The one that gives me concern is this comment by his own supervisor about Boyd because it also indicated that it wasn't just a statement that he was watching him very carefully, had him on the list. Why wouldn't that be sufficient to give by summary judgment? Well, Your Honor, first of all, that occurred in June of 2000, and it was, again, one single occasion, nothing after that. But more importantly is that individual never disciplined him on anything. In other words, Tim Christensen is the one who made that remark. His only discipline, the two write-ups, and the eventual termination came – the two write-ups were from Don Fitzgerald, his supervisor, and the termination was, again, by the HCMP manager, Cheryl Montgomery. So there's no involvement by Tim Christensen in any kind of adverse employment action against him. The statement by itself doesn't rise to the level of an adverse employment action. It would be relevant in his racial harassment claim, certainly. Which you claim was abandoned as a result of the briefing? At the summary judgment stage, yes. Certainly it's relevant to his claim of racial harassment. No one would ever dispute that. But the statement by itself doesn't materially affect the terms and conditions or compensation of employment, absent some other action following that, and here there is no other action following that by Mr. Christensen. There also was no question at the summary judgment stage who the supervisors were. The only time that was raised was he made the claim that with respect to this failure on the package that a dispatcher was equivalent to management, and the district court properly noted that he didn't provide any evidentiary support for that claim and ignored that claim. So that was the only dispute over who was a manager and who was not. Throughout the time, all the managers were identified, and Don Fitzgerald, he testified, was his direct supervisor. Kevin McHugh was the supervisor ahead of that. With respect to the two incidences, the two write-ups that were adverse employment actions, the write-up in July of 1 for the failure to pick up a package and the fueling incident, again, we have a different — there's different circumstances involving each and different supervisors or I should say different decision-makers involved in each. So there was no evidence that there were any similarly situated non-African-American employees that were treated differently with respect to those. Kennedy. How much significance is it proper to put on the defense that it's a different supervisor? As we went through this in the fuel mix-up, we went through it for the package pickup, how much significance is there legally that it's a different supervisor? Well, Your Honor, I think that's very significant, and perhaps the word that we should use is not supervisor but decision-maker, because as you know that racial discrimination or any discrimination is an intentional wrong. Under the Hayes and Paper case, the Supreme Court case says ultimately they have to show that the discrimination or the race or age or whatever we're looking at actually played a role in the decision-making process and had a determinative influence on the outcome. So if you have a decision-maker who is not the same decision-maker in the issue at the case, then there's no evidence or no foundation for the jury to infer. Let me give you a good example. On this fueling incident, Tim Christensen was the individual who allegedly did not discipline Mr. Bennett. Mr. Fitzgerald was the individual who did discipline Mr. Hargrove. Well, those are two different decision-makers. Absent some kind of connection between the two, in other words, that they talked about it or Mr. Fitzgerald knew that Mr. Christensen had not followed the policy correctly or whatever, absent some kind of link or nexus there, there's no foundation for the jury to infer that Mr. Fitzgerald took the action against Mr. Hargrove because of his race. In other words, if he doesn't know, the only proof is he's following the policy. And the assumption there is he believes everyone else is, absent some kind of knowledge on his part, that there are other folks that are being treated differently. One of the difficulties is if you have this, what might here be called kind of a constellation effect, so that you have an incident and then you have a, what they call a performance reminder or a negative mark put into your employment file for doing something, and then you do something else and another person puts that negative employment in your file. If each of those were race-based and could overcome that hurdle, would it matter that there were different supervisors if in the end you have a work environment, a work circumstance where you do have adverse effect in your employment conditions? Theoretically, under that hypothetical, that's possible, but that's not the situation of what we have in this case here. In each case, the two disciplines that he received were from Mr. Fitzgerald. He testified that he thought Mr. Fitzgerald was a good manager and didn't have any intent to discriminate against him. So we don't have a situation where he has multiple incidences of race-based discipline that eventually has an adverse effect on him. That's just not the facts before the court in this particular case. My time is getting limited, so I did want to jump to, well, two things. One, it is important to note that some of the retaliation claims were actually dismissed on summary judgment relating to the reprimands. That's not entirely clear from the record. Only the retaliation claim relating to his termination went on to trial. Again, with the same reason on the race claim, there's no evidence of an adverse employment action except for the written reprimands. Much of the conduct that the plaintiff alleged was retaliatory occurred before the first protected activity in July 2001. So that obviously couldn't be the basis for a retaliation claim because it occurred before the protected activity. Regarding the evidentiary issue, I'd simply want to remind the Court that under the recent Supreme Court case, Sprint v. Mendelson, that the district court has, as you know, a wide latitude and broad discretion in Rule 403 matters. The quote is that it has this discretion due to its familiarity with the details of the case and its greater experience in evidentiary matters. In addition, it comes to this court on an abusive discretion standard, which basically involves you have a spectrum of possible outcomes that are reasonable, and as long as the court's decision falls within that spectrum, then it should be affirmed. In this case, the evidence had very little probative value of the underlying discrimination because that wasn't an issue in this case. The issue is whether a separate decision-maker with no connection to the four to five alleged bad actors, whether this separate decision-maker had a retaliatory motive or not. That was the issue before the jury, not whether the underlying discrimination was true. And then finally, with respect to the issue on the judicial notice, I'd simply reemphasize our argument that that issue was never brought before the court and has been waived before the district court. Thank you. There are a number of issues to address in a very short amount of time, but let me just state unequivocally, it does not appear from the record that the issues discussed with the summary judgment were waived. The district court concluded that Shauna Hargrove did not put on enough evidence, but in actually reading the opposition to the summary judgment, these issues were addressed. So if the court feels that that's an issue, you can go back and take a look. There was a discussion about the opposition, and I did want to touch on that. And, you know, Judge McKeon, you mentioned the constellation effect. The manager issue is easiest to see in the retaliation claims. It applies equally everywhere. But if you look at the retaliation claims and this regional policy, it's not applied equally. And when you talk about who is the manager, well, the person directly above me is the manager. Well, he didn't know about the regional policy, or we're not sure if he knew about it. Well, if it's a policy and some of the managers know about it and some of them don't, well, that doesn't make sense. It's not a written policy. Supposedly, it was communicated a number of different times. You look at the case of the woman in Texas. You look at Mr. Bennett. They weren't they didn't get performance reminders in their file. In fact, there was a warning letter put in Diane LaMonica's file, and it was pulled out after the fact. So there was no equal imposition of these supposed regional policies. And when you talk about a region, managers in a region, it's hard to separate suddenly, well, this is my immediate supervisor and this is a manager next door, because they seem to all be working together as a regional management team. And if you look at the request for judicial notice, there's no attempt to inject other issues into the case other than to say, if this were to go back to trial and there were no severe limitations placed on what Sean Hargrove could raise. Was there evidence they were next door and they worked together? I'm sorry, Your Honor. Who next door? I apologize. Was there evidence that these people were next door to each other and worked together? Mr. McHugh, Mr. Christensen, Mr. Fitzgerald, they all worked in the Arizona station and they appeared to work together. Did they work next door to each other? Well, you know, I apologize, Your Honor. I'm not sure of their physical proximity, but it appears that they worked together in the station. Well, we have to stick with the facts because the district judge made the decision, the summary judge, based on facts. And whatever facts you put in, if you put in facts they were next door and worked together, that's one issue. If they were just in the same town, that's another. They were not in the same town. They were at the same physical station and they worked as managers at the same physical station. And when there was a disciplinary action, it appears from the evidence in the record before the district court that various, quote, managers were consulted, Mr. Christensen and Mr. McHugh and Mr. Fitzgerald. And there's no evidence in the record to talk about who controls the dispatcher. That's accurate. There's no evidence. But the dispatcher, in one instance, and I believe her name was Jennifer. We don't know her last name. It's not clear from the record. The dispatcher orders Sean Hargrove to pick up a package for some other person, which is actually an increase in job duties. He doesn't, why is she doing this? No, that's not explained in the record. When he says, no, I'm not going to do that, that's not part of my job, just so this woman can get off early, which is essentially what the request came down to, he's reprimanded. But when two other employees, that's the Zappia-Gu incident, are asked, can you please pick up a package on Sean Hargrove's route because he can't complete this route, take the package from him and take it to the customer, no discipline. So there are numerous instances of inconsistencies in what counts as a regional policy, as a policy within the station. And if you look at all the cases coming out of this circuit in the past, it appears that these kinds of discrepancies are evidence of a hostile work environment, of a progressively difficult situation for the employee at issue. And if you look at the record at page ---- Your time has expired. Oh, it says I have a minute left. Oh, I'm a minute over. So you've got over a minute, and I did want to let you finish that last minute before interrupting you. Thank you so much, Your Honor. I want to thank both counsel for your argument this morning, especially Ms. Klatchko. I note here that this is a pro bono case for you under the court's pro bono program. And we very much appreciate the extensive time and briefing and coming over here for argument. I know that it's always easier even for the other side when you have a professional brief to respond to, and it's also very helpful to the court. And I'm sure your client appreciates it as well. So thank you on behalf of the court. The case just argued. Hargrove v. Federal Express Corporation is submitted.
judges: Wallace, Farris, McKeown